IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


FAIRCHILD DORNIER GMBH, <u>ET AL.</u>,   )
                                        )
          Appellants,                   )
                                        )
v.                                      )
                                        )   No. 1:05cv352
THE OFFICIAL COMMITTEE OF               )
UNSECURED CREDITORS,                    )
                                        )
          Appellee.                     )
_____        )
                                        )
IN RE:                                  )
DORNIER AVIATION                        )
(NORTH AMERICA), INC.,                  )
                                        )
          Debtor.                       )


<u>MEMORANDUM OPINION</u>

     Appellants Fairchild Dornier GMBH, a German aircraft
manufacturer, and Dr. Eberhard Braun, Insolvency Administrator
for Fairchild Dornier GMBH (collectively "GMBH"), have appealed
the decision of the bankruptcy court to recharacterize
appellants' sale of spare parts inventory to the debtor as equity
rather than debt.  The recharacterization resulted in the
effective subordination of appellants' claim to those of all
creditors in the debtor's bankruptcy.  The debtor, Dornier
Aviation (North America) ("DANA") is a wholly owned subsidiary of
Appellant GMBH that was created to support GMBH's aircraft sales
by providing warranty and other spare parts services to GMBH's

customers in North and South America and China.[1]  Appellee is the
Official Committee of Unsecured Creditors ("Committee")
representing the interests of all unsecured creditors in the
bankruptcy.  Appellants seek a reversal of the bankruptcy court's
decision or, in the alternative, a reduction in the transactions
subject to recharacterization.

The primary issue on appeal is whether the bankruptcy court
erred as a matter of law in recharacterizing GMBH's sales of
spare parts inventory to DANA as equity contributions.
Appellants also argue, in the alternative, that the bankruptcy
court erred as a matter of law at least in recharacterizing the
portion of the debtor's sales receivables that the court did not
find to have been assumed by GMBH.  Finally, appellants maintain
that the bankruptcy court was clearly erroneous in making the
following factual findings in support of its decision to
recharacterize: (1) that GMBH agreed that the debtor had to repay
its debt to GMBH only after the debtor had paid all of its
creditors; (2) that GMBH treated the debtor specially and unlike
other customers with respect to its expectation of repayment; (3)
that GMBH's assumption of the debtor's losses from spare parts

---

[1] The parties' briefs and the bankruptcy court's opinion
describe a complex web of relationships involving numerous
ownership changes among various parent companies and
subsidiaries.  For purposes of this appeal, it is critical to
understand only that GMBH was the sole shareholder of DANA's
parent company (DAHNA).

sales constituted a conversion of the debtor's debt into equity; and (4) that the debtor, which was adequately capitalized when formed, became inadequately capitalized after corporate restructuring.

## Background

This action arises from the involuntary bankruptcy petition filed against DANA by its former employees on April 24, 2002, following the commencement of insolvency proceedings against GMBH under German law.  DANA did not contest the bankruptcy, which was converted to Chapter 11 on May 20, 2002.  A liquidation plan was confirmed on February 14, 2003.  Dr. Braun and GMBH, uncertain as to which of them possessed a claim against the debtor, filed identical proofs of claim against DANA; those claims were consolidated by the bankruptcy court.  After two amendments, the amount of the claim stood at $146,143,823.06.  On September 27, 2002, the Committee filed a complaint seeking to equitably subordinate the entire claim of GMBH or, in the alternative, to recharacterize the alleged debt as an equity investment.  On November 26, 2002, the Committee filed an objection to the proofs of claim.  The bankruptcy court consolidated the adversary proceeding and the claim objection for purposes of trial.

Although GMBH's claim contained numerous components, the only one contested in this appeal is the bankruptcy court's treatment of a $76,926,051.65 claim for the value of spare parts

inventory that GMBH had sent to DANA but for which DANA had not paid GMBH.  DANA received these parts to provide warranty replacements and initial provisions to GMBH customers as well as to sell to its own customers.  GMBH customers received a warranty and could purchase initial provisions from GMBH, but DANA handled the distribution of the parts from the inventory it purchased from GMBH.  DANA's inventory purchases were not broken down between supplies for initial provisions, warranty and general resale.  Rather, DANA was responsible for tracking parts supplied to GMBH customers as initial provisions or warranty replacements and billing the corresponding amounts back to GMBH.  GMBH then was to give DANA credit against its balance of receivables.  GMBH sold the parts to DANA at a discount from the general list price, in theory enabling DANA to turn a profit.

The bankruptcy court noted that the determination of the exact amounts owed by DANA to GMBH for parts shipped was made difficult as a result of GMBH's accounting practices.  First, GMBH's system did not tie DANA's credits to specific invoices, but simply netted the credits against the gross amount billed to DANA for parts shipped.  Accordingly, there is no way to distinguish between due and paid invoices.[2]  In addition, despite

---

[2] The bankruptcy court rejected, however, appellee's argument that GMBH had not substantiated the amount of the claim, despite the accounting weaknesses, which also included destroyed records and unexplained line entries.  The court noted that GMBH and DANA reconciled their accounts annually and routinely agreed

the notation on the invoices that they were due within 30 days
"unless otherwise agreed," as discussed below in the context of
recharacterization, GMBH appears to have been operating
internally on the understanding that DANA would not have to pay
for the parts until it became profitable, which never happened.
Based on various statements of accounts signed by both parties
and on GMBH's expert testimony employing statistical sampling,
the bankruptcy court arrived at the following breakdown of the
spare parts claim, for which the court found DANA had admitted
full liability: (1) $18,497,953.20 in payables accrued before
October 1, 1996, (2) $12,726,163.48 accrued between October 1,
1996, and September 30, 1999, and (3) $44,708,935.84 accrued
after October 1, 1999.

Also of relevance to the issues on appeal are the findings
contained in a PricewaterhouseCoopers ("PWC") Audit Report that
examined GMBH's finances as of September 30, 2000, and GMBH's
Management Report for fiscal year 1999/2000.  PWC concluded that
the Management Report "provide[d] a suitable understanding of the
Company's position and suitably present[ed] the risks of future
development."  Audit at 29.  The Audit reflected that as of

---

on the amounts owed--except in the case described below in which
GMBH's accounting reflected a figure approximately $55 million
above that represented in an independent audit.  The court
explained that this difference was relevant to recharacterization
but did not invalidate the accounting system.

September 30, 2000, DANA[3] owed GMBH $27,799,799.55.  This is approximately $55 million less than the $83,027,903.05 shown on an annual reconciliation conducted by the companies three months earlier.  As such, the Audit stated that GMBH's negative $170.1 million result in fiscal year 2000 "mainly resulted from the assumption of losses of the subsidiary DAHNA [and an increase in bank loan interest]" and noted that "[t]he receivable from DAHNA was reduced by TDM 68,674 [German currency] as additional payments to DAHNA were no longer required in view of the fact that the losses, incurred by DAHNA were taken over by GMBH." Audit at 20, 72.  Finally, the Audit explained why GMBH had assumed the losses of its subsidiary:

> [The two companies] are so close that there is an extensive and also financial dependency of DAHNA and its two subsidiaries to [GMBH].  In particular, there is a continual relegation of interests to DAHNA as a result of the assumption of warranty obligations which both subsidiaries (DAMSI and DANA) assume for the business of [GMBH].
>
> . . .
>
> [The] warranty obligations . . . have resulted in substantial losses being incurred by the dependent DAHNA group in the past.  In view of the fact that the continued existence of the DAHNA group is in the best interests of GMBH, the company has therefore made a liability provision for the losses incurred by the DAHNA group.  The provision includes compensation for the losses incurred for the three

---

[3] The amount reflected is actually that owed by DAHNA, which also owns another subsidiary; however, there is no dispute that the bulk of the receivables were related to DANA.

6

> companies.  In particular, [GMBH] records expenses incurred by the DAHNA group which are directly financed by [GMBH] as a provision of utilization.

Audit at 29.  Similarly, the Management Report itself, which is dated March 2001 and upon which the Audit relied, explained that

> DANA's losses which have been taken over were based on the negative economic development of its spare parts business for Fairchild Dornier aircraft on the US-American market. [Management is] anticipating positive results in the medium-term in view of the restructuring of our customer services.  In the near future, we are however assuming that DAHNA will generate losses which will have to be borne by [GMBH].

Management Report at App. IV, p. 17, ¶ 12.2; p. 24, ¶ 4.3.3.

Furthermore, Thomas Brandt, CEO of GMBH and a member of the Board of Management at the time of the Report and the Audit, testified before the bankruptcy court that GMBH would not seek repayment of DANA's spare part receivables until after DANA was profitable, although GMBH did ultimately expect the company to turn a profit and pay the amounts owed.  Brandt testified that this arrangement benefitted both parties because DANA's ability to build up its service business would make GMBH aircraft more attractive to North American customers.

**Discussion**

I.   <u>Standard of Review</u>

In sitting as an appellate court, this Court reviews the bankruptcy court's legal conclusions <u>de novo</u> and its factual findings for clear error.  As explained by the Fourth Circuit:

> Under the clearly erroneous standard, a reviewing court will not reverse 'simply because it is convinced that it would have decided the case differently.' A finding of fact is clearly erroneous only when the reviewing court 'is left with the definite and firm conviction that a mistake has been committed.' 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'

Citizen's Bank of Md. v. Broyles, 55 F.3d 980, 983 (4th Cir. 1995)(citations omitted).

II.   Questions of Law

A.   Overview of Claim Allowance and Ordering Procedures

Appellants' primary argument relies on the premise that the Bankruptcy Code and Rules prescribe the only procedures for disallowing and subordinating claims and that a bankruptcy court may not override those provisions through equitable relief. Under the Code, a proof of claim is allowed unless an objection is filed, at which time a court must determine the validity and amount of the claim.  Specifically, 11 U.S.C. § 502(b) provides that a court "shall" allow a claim unless an objection is filed and a recognized exception applies.  In addition, however, § 510(c) allows for equitable subordination, by which a court may "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest" in instances in which inequitable conduct by an insider creditor "resulted in injury to the creditors of the bankrupt or

conferred an unfair advantage on the claimant."  <u>See</u> <u>also</u> <u>United</u>
<u>States v. Norland</u>, 517 U.S. 535, 539 (1996).  Finally, § 105(a)
allows a bankruptcy court, which sits in equity, to "issue any
order, process or judgment that is necessary or appropriate to
carry out the provisions of this title" and mandates that "[n]o
provision of this title . . . shall be construed to preclude the
court from, sua sponte, taking any action or making any
determination necessary or appropriate to . . . prevent an abuse
of process."  <u>See</u> <u>also</u> <u>Landbank Equity Corp. v. Levy</u>, 973 F.2d
265, 271 (4th Cir. 1992).  Still, a court may not disregard or
contradict specific provisions of the Code in crafting equitable
relief.  <u>See</u> <u>id.</u>

     B.   <u>Whether the Bankruptcy Court Erred in Recharacterizing</u>
         <u>Appellants' Spare Parts Claim as Equity</u>

        1.   <u>Whether Courts Generally Possess the Power to</u>
            <u>Recharacterize Debt as Equity</u>

Despite a recognized disagreement among courts as to the
propriety of recharacterizing debt as equity and appellants'
argument that to do so conflicts with the Code's more explicit
provisions, most courts, including the Eastern District,
recognize recharacterization as fully supported by § 105(a).  As
the Sixth Circuit noted in <u>In re AutoStyle Plastics, Inc.</u>, in at
least two cases, <u>In re Pacific Express, Inc.</u>, 69 B.R. 112, 115
(9th Cir. 1986), and <u>In re Pinetree Partners, Ltd.</u>, 87 B.R. 481,
491 (Bankr. N.D. Ohio 1988), courts have held that

recharacterization is not authorized by any specific provision of

the Code.[4]   See 269 F.3d 726, 748 (6th Cir. 2001).  Conversely,

numerous courts have held that recharacterization is a proper

application of a bankruptcy court's equitable powers under

§ 105(a) and is consistent with the court's duty to "disregard

outward appearances of [a] transaction and determine its actual

character and effect."   See In re Fett Roofing & Sheet Metal Co.,

_____

[4] None of the other cases upon which appellants attempt to
rely support their position.  For example, they argue that the
Fifth Circuit "expressly held" in In re Mobile Steel Co. that
bankruptcy courts lack the power to recharacterize debt as equity
and must instead apply equitable subordination by citing to the
court's statement that the "bankruptcy judge exceeded the bounds
of his equitable jurisdiction" by *disallowing* certain claims that
it found to be capital contributions, not loans.  See 563 F.2d
692, 702 (5th Cir. 1977).

Similarly, appellants refer to In re Landbank as a
statement by the Fourth Circuit in an "analogous case," when the
court in that case rejected the *disallowance* of tax claims in
favor of their equitable subordination.  See 973 F.2d 265, 272
(4th Cir. 1992).

Appellants' reliance on these cases demonstrates that they
miss the distinction between recharacterization and equitable
subordination.  First, Mobile Steel does not support appellants'
argument because the Fifth Circuit only directly addressed
equitable subordination.  Second, as explained in Diagnositics
Inc. v. Ingalls, recharacterization does not amount to
disallowance.  See 121 B.R. 626, 630-31.  The doctrine simply
reclassifies the claim as a capital contribution—which
constitutes effective *subordination*.

Finally, appellants quote out of context the Fifth
Circuit's statement in In re Herby's Foods, Inc. that it did not
need to decide the issue of recharacterization.  See 2 F.3d 128,
133 (5th Cir. 1993).  In the sentence before that statement, the
court had noted that the "Insiders" had conceded that the court
had the power to recharacterize debt as equity even when
equitable subordination was not appropriate, the very position
against which appellants argue on appeal.

Inc., 438 F. Supp. 726, 729-30 (E.D. Va. 1977), affirmed by, In Re Roofing & Sheet Metal Co, Inc., 605 F.2d 1201 (4th Cir. 1979); In re Cold Harbor Assocs., 204 B.R. 904, 915 (Bankr. E.D. Va. 1997); see also AutoStyle Plastics, 269 F.3d at 748-49; In re Hedged-Invs. Assocs., 380 F.3d 1292, 1297 (10th Cir. 2004); In re N & D Props., Inc., 799 F.2d 726, 733 (11th Cir. 1986).[5]  Notable for purposes of this appeal is the Cold Harbor decision from this district, which is among the cases cited most often for this proposition.  See 204 B.R. at 915 ("[a court] is not required to accept the label of 'debt' or 'equity' placed by the debtor upon a particular transaction, but must inquire into the actual nature of the transaction to determine how best to characterize it.").  Finally, although the Fourth Circuit has not addressed the issue directly, as far back as 1957, in L&M Realty Corp. v. Leo, the court appeared to recognize recharacterization as distinct from equitable subordination.  See 249 F.2d 668, 671-72 (4th Cir. 1957).  In that case, the court found that a controlling

---

[5] Many courts site Pepper v. Litton as the first articulation of this power, although the Supreme Court did not use the term "recharacterization."  See 308 U.S. 295, 306 (1939) ("so-called loans or advances by the dominant or controlling stock holder will be . . . treated in effect as capital contributions.").  Although this case involved improper conduct, and therefore by modern standards, the Court's action would constitute equitable subordination, the Court neither stated nor implied that a separate remedy of recharacterization would be improper.  Rather, this opinion pre-dated the recognition of both equitable subordination and recharacterization, the distinct contours of which have evolved only fairly recently.

stockholder's claims should be subordinated because his
transactions were not at arms-length and the cash advances he
made were necessary for working capital and "part of a plan of
permanent, personal financing, to avoid the necessity of
increasing the capital of the corporation."  Id. at 671.  The
court then found that the claim *also* should have been
subordinated on the "*additional*" ground that the shareholder had
acted fraudulently in obtaining a loan from another creditor.
Id. at 672.[6]  As such, this opinion appears to recognize two
separate grounds for subordination--one based on the actual
nature of the transaction (recharacterization) and one based on
the conduct of the parties (equitable subordination).

    As explained in numerous recent opinions, the courts that
have found tension between recharacterization and equitable
subordination appear to misunderstand the distinction between the
two concepts.  See, e.g., In re Submicron Sys. Corp., 291 B.R.
314, 323 (D. Del. 2003) ("Some of the confusion between the
doctrines is caused by the fact that undercapitalization is a
factor in the equitable subordination analysis and often is a
factor in a recharacterization analysis, leading some courts to
equitably subordinate claims that other courts would

---

    [6] Appellants cite only this fraudulent ground and either
miss or ignore that the court devoted most of its opinion to the
*separate* finding that the claim should be subordinated simply
because of the nature of the relationship and the transaction.

12

recharacterize as equity contributions.").  The Tenth Circuit recently provided a clear explanation of the difference, noting that when a loan is recharacterized, courts effectively ignore the label on the transaction and focus on its substance, with the result that the advancement is no longer considered a debt to be repaid in bankruptcy but rather a capital contribution.[7]  <u>See Hedged-Invs.</u>, 380 F.3d at 1297.  In contrast, the court described equitable subordination as looking "not to the substance of the transaction but to the behavior of the parties involved."  <u>See id.</u>  In that event, the advancement of funds is still considered debt, but "courts seek to remedy some inequity or unfairness perpetrated on the bankrupt entity's other creditors or investors by postponing the subordinated creditor's right to payment until others' claims have been satisfied."  <u>Id.</u>  The Tenth Circuit also reiterated a comprehensive description provided by the Sixth Circuit in <u>AutoStyle Plastics</u>, a case cited by appellants as well as appellee both before the bankruptcy court and on appeal:

> Not only do recharacterization and equitable subordination serve different *functions*, but the *extent to which a claim is subordinated* under each process may be different. These are facts that the <u>In re Pacific Express</u> court appeared not to recognize. Recharacterization cases turn on whether a debt actually exists, not on whether the claim should be equitably subordinated. In a

---

[7] One bankruptcy court has aptly termed this process not as *re*-characterization, but rather as *characterization* of the claim's true nature.  <u>In re Georgetown Bldg. Assocs.</u>, 240 B.R. 124, 137 (Bankr. D.D.C. 1999).

> recharacterization analysis, if the court determines
> that the advance of money is equity and not debt,
> the claim is recharacterized and the *effect* is
> subordination of the claim as a proprietary interest
> because the corporation repays capital contributions
> only after satisfying all other obligations of the
> corporation. In an equitable subordination analysis,
> the court is reviewing whether a legitimate creditor
> engaged in inequitable conduct, in which case the
> *remedy* is subordination of the creditor's claim to
> that of another creditor *only to the extent*
> *necessary* to offset injury or damage suffered by the
> creditor in whose favor the equitable doctrine may
> be effective.

Id. (assessing separately arguments for equitable subordination

based on inequitable conduct and for recharacterization as equity

based on the nature of the transaction)(quoting 269 F.3d at 748-

49)(emphasis in original).

Appellants cite Fourth Circuit cases to support the

proposition that a bankruptcy court may not use equity to

override the Code's specific provisions governing equitable

subordination and claim exception and note that this Court

followed that same line of reasoning in overturning the

bankruptcy court's previous decision regarding DANA executives'

avoidance of preference claims.  See Landbank, 973 F.2d 271;

Official Comm. of Equity Sec. Holders v. Mabey, 832 F.2d 299, 302

(4th Cir. 1987).  However, these cases and our recent opinion are

distinguishable from the instant action because the issues in

those cases were specifically addressed by provisions of the

Bankruptcy Code, and the equitable remedies crafted by the lower

courts thus directly conflicted with the applicable law as set

14

forth by Congress.  See Landbank, 973 F.2d at 271-72; Mabey, 832
F.2d at 302.  In this case, as described above, a proper
understanding of the distinction between recharacterization and
equitable subordination reveals that appellants incorrectly
characterize the two as providing alternate remedies for the same
set of circumstances.  Indeed, a claim that is properly addressed
under one doctrine would not fit the confines of the other.
Furthermore, appellants' contention that recharacterization
conflicts with § 502(b), which lists specific exceptions to the
general presumption of claim allowance, is erroneous.[8]  The
exclusions in § 502(b) address the *disallowance* of debts that are
unenforceable for reasons such as non-biding agreements, lack of
maturity and claims by insiders for more than the reasonable
value of services provided.  This is far different from the
properly understood function of recharacterization, which does
not disallow, but rather effectively subordinates otherwise valid
obligations on the basis that they do not truly represent debt.
Thus, properly understood, recharacteriaztion of an alleged debt
as equity does not violate Fourth Circuit precedent or either of

---

[8]  Appellee also correctly contends that GMBH's claim that
recharacterization is improper under the Bankruptcy Code is
inconsistent with GMBH's failure to appeal a previous decision by
the bankruptcy court granting summary judgment to the Committee
regarding its claim that a $43,543,000 loan from GMBH to DANA to
purchase an aircraft wing production business from another branch
of the corporate family tree, Fairchild Aircraft, Inc., should be
recharacterized as equity.

the Code provisions cited by appellants.

Accordingly, the bankruptcy court applied the proper legal framework and did not err by conducting recharacterization analysis of appellants' claim, although the court's opinion would have been clearer if the court had not addressed equitable subordination at all.  In keeping with the distinct nature of the two doctrines, a number of courts have explained that if a court determines that recharacterization is appropriate, equitable subordination analysis "never comes into play" because there is no debt to be subordinated.  See, e.g., In re Atlanticrancher, Inc., 279 B.R. 441, 432 (Bankr. D. Mass. 2002); Georgetown Bldg. Assocs., 240 B.R. at 137 (citing Cold Harbor for the proposition that "[a]uthority to treat [apparent debt] as equity . . . is well supported by case law," explaining that "[t]his is not an exercise in equitable subordination" and faulting the Pacific Express court for missing the distinction).  For obvious reasons, these authorities also recommend that a court conduct the recharacterization analysis before addressing equitable subordination, which could become moot.  See, e.g., Atlanticrancher, 279 B.R. at 432.

In the instant case, the bankruptcy court addressed equitable substitution first, likely because appellee raised that doctrine as its first line of defense.  Appellants repeatedly cite the court's statement below with regard to equitable

16

subordination as proof that the court found that a valid debt
existed and therefore erred in overriding that debt through
equitable means:

> [The] debts embodied in the proof of claim are the
> very kind of debts one would expect a company such
> as DANA to incur in the ordinary course of business.
> If DANA had not purchased spare parts from GMBH, it
> would have purchased them from someplace else.
> There is no evidence that the prices charged by GMBH
> exceeded what the debtor could have obtained
> elsewhere or that GMBH imposed terms relative to the
> various extensions of credit that were
> disadvantageous to the debtor. Nor is there any
> evidence that DANA was operated in a way designed to
> cheat its trade debtors.

Op. at 33-34.  However, in assessing whether equitable
subordination was warranted, the court simply was addressing the
requirement of improper conduct by GMBH and finding that none
existed.  This finding in no way precludes the court's later
determination that what appeared on its face to be a debt
relationship actually comprised a capital investment by GMBH in
its subsidiary.  Thus, although the bankruptcy court might have
prevented this appeal by deciding the recharacterization issue
first and then finding that equitable subordination did not apply
because no debt existed, the court's subsequent application of
the recharacterization doctrine remains unaffected and valid.

   C.   Whether the Court Erred in its Application of the
        Recharacterization Doctrine

_____The bankruptcy court applied the recharacterization analysis
just as it has been articulated by numerous courts.  The factors

to be addressed, although articulated slightly differently by various of those courts, are not disputed by the parties.  In Cold Harbor, the court listed them as: (1) the names given to the certificates evidencing the indebtedness, (2) the presence or absence of a fixed maturity date, (3) the source of payments, (4) the right to enforce payment of principal and interest, (5) participation of management flowing as a result, (6) the status of the contribution in relation to regular corporate creditors, (7) the intent of the parties, (8) "thin" or inadequate capitalization, (9) an identity of interest between creditor and stockholder, (10) the source of interest payments, (11) the ability of the corporation to obtain loans from outside lending institutions, (12) the extent to which the advance was used to acquire capital assets and (13) the failure of the debtor to repay on the due date or seek postponement.  204 B.R. at 915. The bankruptcy court in this action cited similar lists set forth by the Sixth Circuit in Autostyle Plastics and by the Tenth Circuit in Hedged-Investments.  See 269 F.3d at 750; 380 F.3d at 1298.  The court also cited the summary propositions that no one factor is determinative and that the essential inquiry is "whether the transaction bears the earmarks of an arms-length bargain."  See, e.g., In re Kids Creek Partners, L.P., 200 B.R. 996, 1019-1020 (Bankr. N.D. Ill. 1996).

The bankruptcy court applied these factors properly in

arriving at its conclusion that in substance, the sales transactions represented equity, not debt.  Again consistent with appellate courts and with this district in <u>Cold Harbor</u>, the court weighed the factors and explained which facts it found more consistent with characterizing the transactions as debt and as equity.  Although the court found the "instruments" evidencing the claim, including the invoices and statements of account and the accrual of interest, consistent with treating the claim as debt, the court concluded that more factors supported treating the claim as equity.  Significantly, the court relied upon the lack of a fixed maturity date and the arrangement by which payment would only be made when DANA became profitable, which the court described as a <u>de facto</u> subordination of the inter-company liability to the current claims of trade creditors, and stated that "[i]ndeed, the hope of payment out of future profits is exactly what characterizes an equity investor."  The court also cited testimony by Brandt, who characterized GMBH's relationship with DANA and willingness to postpone collection until DANA was profitable as a "market investment" for GMBH.[9]  In addition, the

_____

[9] Brandt's testimony also included the following description of GMBH's relationship with DANA and expectations regarding repayment:

> [Dana] was a third party but it was a sister to us or a daughter. . . . [T]o third parties which are not associated companies [repayment was required in] 30 days. But within the group there were different agreements and different . . . procedures.  Tr. At 139.

court opined that a third-party lender likely would not have
considered DANA an attractive borrower, based on DANA's long
history of unprofitability and the fact that at least after
restructuring, DANA's liabilities far exceeded its assets and the
company appeared to be "woefully" undercapitalized.

Finally, the court placed the greatest weight on GMBH's
decision to "assume" DANA's losses related to the spare parts
receivables and on the statements in the Management Report
regarding the assumption of those losses and the expectation that
GMBH would need to continue to support DANA in this fashion in
the future.  The same Report explained that because the survival
of the DAHNA group was in GMBH's best interests, GMBH "has
therefore made a liability provision for losses incurred by the
DAHNA group."  The Audit and Management Report were important to
the court's analysis because GMBH was looking for additional
capital investment at the time, meaning that the assumption
"[was] effectively an acknowledgment that the sums which GMBH had
been carrying on its books as intercompany debt could not be

. . .

My testimony is that DANA had an obligation to pay but
the time was not fixed. . . . [I]n the initial years of
investment to [sic] this market, GMBH . . . financed DANA
via this debt.  So, they don't ask for that payment
before they have positive cash flow.  Tr. At 142-43.

Brandt went on to explain this as a tacit agreement to waive
payment until DANA was cash-flow positive that had been executed
since at least 1993, when he joined GMBH.

20

characterized to outside investors as ordinary debt receivables."

Appellants argue that the bankruptcy court's finding that GMBH assumed DANA's debt goes against the weight of the evidence, which they contend demonstrated that GMBH expected full payment for the parts, never legally forgave the obligations and never recorded a capital contribution on its books.  This argument fails because an eventual expectation of repayment does not conflict with the bankruptcy court's finding that on balance, the substance of the relationship represented a capital contribution designed to prop up the struggling subsidiary.  Rather, the bankruptcy court's thorough analysis of the multiple factors was consistent with the law of recharacterization.

Most of appellants' further arguments appear to miss the same fundamental premise--that recharacterization is allowable within the equitable powers of a bankruptcy court, which is charged with distinguishing the substance from the form of transactions and characterizing them accordingly.  Appellants' primary contention is that the debt cannot be recharacterized because such recharacterization is only proper, if at all, when a transaction constituted an equity contribution ab initio.  See Autostyle Plastics, 269 F.3d at 747-48; Cold Harbor, 204 B.R. at 915.  Appellants maintain that the sales clearly were not designed as equity from the outset because they were accounted for as "payable" and "receivable" and because DANA was not in

financial trouble or undercapitalized[10] when the spare parts sales began.  As such, they argue that the bankruptcy court erred in basing its conclusion that the transactions comprised capital contributions on events that occurred after at least some of the transactions had been completed.  Specifically, appellants argue that the court's reliance on the "assumption" explained in the Audit and the Management Report and the court's conclusion that no third party would have extended financing to DANA,[11] were improper because those events have no bearing on the initial characterization of the transactions.  They also contend that the

---

[10] Appellants argue repeatedly that DANA was adequately capitalized at the time the spare parts sales began and that DANA's capitalization in 2001 is irrelevant to the court's consideration of the nature of the transactions at issue.  They also argue that even if DANA's capitalization in 2001 were relevant, the facts would support characterizing the sales as debt because DANA had by 2001 received a "wing loan," which the court also recharacterized as equity and which, as such, would have provided more than sufficient capitalization.  These arguments are only marginally relevant because although undercapitalization is a requirement for equitable subordination, it is but one factor to be considered in recharacterization analysis. Furthermore, as appellee asserts, the bankruptcy court credited the testimony of the Committee's expert that DANA was undercapitailzed and concluded that DANA's parent company had equity capital of $50,000 and negative shareholder equity of $48,023,361, while carrying more than $100 million in debt due from DANA.

[11] Appellants also state that appellee did not carry its burden of proof in this regard, as the bankruptcy court acknowledged that no evidence was presented on the issue. However, the court reasonably based its conclusion on evidence of DANA's long-running history of financial instability.  Appellee also notes that only trade creditors or customers, not third-party lenders, have filed claims against DANA in the bankruptcy.

court's reliance on the Audit was improper because the court acknowledged that the Audit was inconsistent with the accounting records, which the court found were valid agreements and which carried the account balances forward.[12]

However, the court's assessment of these issues within the contextual nature of recharacterization analysis was proper in light of GMBH not requiring payment until DANA was profitable and the Audit's and Management Report's explanations of GMBH's motivations.  This evidence fully supports the conclusion that the relationship between the companies was such that even though the companies recorded their transactions as debts, GMBH had *always* intended to support DANA and not to require DANA to repay the debt until it was profitable.  The bankruptcy court's use of later events to understand GMBH's broader intent is entirely consistent with the holistic nature of recharacterization analysis.  Given the purpose of recharacterization and the

---

[12] Appellants also make a sweeping argument that if recharacterization of such debts is allowed, "virtually every type of creditor [would be] at risk of having a claim recharacterized."  This again demonstrates appellants' misunderstanding of the rationale behind the court's decision, which was based on the circumstances of this particular symbiotic relationship between a wholly owned subsidiary and its sole shareholder.

In addition, appellants argue that the court's consideration and rejection of the Committee's statute of limitations challenge to some of the contracts proves that the contracts could not have represented equity.  Because the statute of limitations is generally addressed before the substance of any claim, this argument has no merit.

premise of equitable relief, both of which involve uncovering the true, and often hidden, nature of a transaction or arrangement, the bankruptcy court properly examined the totality of the circumstances, rather than taking the formalities or GMBH's label at face value.

Appellants' final contention--that only loans of money, not sales of inventory, can be recharacterized--although somewhat different from their other arguments, also rests on a misunderstanding of the recharacterization doctrine.  Appellants correctly point out that all of the cases discussing recharacterization, and a number of the factors that bear on that analysis, relate to loans of money and not sales of inventory.[13] However, this argument again puts form over substance, as the relationship between GMBH and DANA with regard to the debt also could be viewed as a "loan" of the funds that otherwise would be due under the sales arrangement.  Appellants attempt to refute this logic by arguing that the crafting of such an arrangement would constitute the type of misconduct that underlies equitable subordination and therefore that recharacterization improperly overlaps with the proper application of that doctrine.  We do not find tension between the bankruptcy court's dual findings that GMBH did not act with improper intent, which meant that their

---

[13] Appellants have not cited to any authority that specifically states that only a loan of money can be recharacterized.

claims should not be equitably subordinated, and that GMBH had insider financial knowledge and admitted motivations to support DANA's continued existence, which in this case resulted in a sales arrangement that was not an arms-length transaction and required recharacterization.  Instead, as discussed above, the findings are consistent with the distinctions between the two doctrines.

> D.   Whether the Court Erred in Recharacterizing the
>      $27,779,779 of Receivables That Was Not "Assumed"

We also find that the bankruptcy court correctly recharacterized the entire spare parts claim, including that portion that was not specifically "assumed" in the Audit.  As the bankruptcy court acknowledged, it is "not easy to determine what portion of the present claim should be treated as having been 'assumed,'" which was the most influential factor in the court's treatment of the sales as equity.  Op. at 38.  The difficulty results in part because the reporting period covered by the Audit that discussed the assumption of DANA's debt ended 19 months before the bankruptcy filing.  In addition, the $27,799,799 that was still considered at the time of the Audit to be a viable receivable did not correspond to any line item or discernable combination of line items on the inter-company statement that had

been signed for the same fiscal reporting period.[14]   The court

also observed that the "write-down"[15] of DANA's debt was

reflected in the audited financial statements for investors and

the outside world but not on the internal accounting records,

which continued to carry the pre-audit account balances forward.

However, the bankruptcy court concluded, based largely on the

---

[14] The bankruptcy court did note, however, that DANA paid
GMBH an almost identical sum of $27,998,779 roughly four months
after the Audit.

[15] Appellants point to the court's use of the term "write-
down" as evidence of the erroneous basis for the court's opinion,
explaining that a "write-down" in accounting does not mean that
the debtor has been released from its obligation.   However,
appellants miss the court's emphasis not simply on the facial
effect of GMBH's accounting mechanisms but on the Audit's and
Management Report's explanations of the "assumption" of DANA's
debt, of GMBH's "family" relationship with DANA and of GMBH's
resulting self-interest and motivation in supporting DANA
financially.   This is surprising, given appellants' own citation
to the following from the Audit:

> GMBH also assumes the financing of this company to a
> very large extent, however.   The losses of the DAHNA
> group are assumed by GMBH in view of the close
> business relationship involved.   A write-down of the
> receivables is not necessary as management
> anticipates the continuation of DAHNA and its
> subsidiaries in the existing structure and thereby
> presumes that the existing receivables from DAHNA
> have an intrinsic and sustained value.

Audit at n.74.   Rather than demonstrating that there was no
special treatment afforded DANA, this quote supports the
bankruptcy court's conclusions that regardless of the formalities
of maintaining the debt on the books or even the actual
expectation of payment once DANA became profitable, GMBH had a
symbiotic relationship with DANA and that the spare parts
transactions were far from arms-length dealings.   Thus, even if
the bankruptcy court misused the term "write-down," the court's
underlying reasoning remains consistent with proper
recharacterization of the sales transactions.

explanation in the Audit, that the write-down, or assumption, by GMBH "centered on that portion of the DAHNA receivable that involved DANA's spare parts business [and that] [t]here [was] no reason why the spare parts transactions after the audit should be treated as any less a 'market investment' than those predating it." Op. at 39.  This conclusion is consistent with the findings that the claim was actually equity not debt because GMBH intended the sales arrangement as an investment of capital from the outset and that the entire arrangement continued in the same vein after the Audit--especially given that DANA had not yet become profitable and apparently still needed to be propped up financially to serve the interests of its parent GMBH.  Had appellants demonstrated a significant change in the fortunes of DANA, the nature of the transactions might have evolved over time.  However, at the time of the bankruptcy, DANA remained unprofitable, and GMBH does not appear to have changed its position regarding the amounts past due.  Accordingly, the bankruptcy court properly treated all of the spare parts sales as a capital contribution by GMBH to its subsidiary.

III. <u>Whether the Court's Conclusion That GMBH's Deferral of Repayment Constituted an Equity Investment in DANA Was Based on Factual Findings That Went Against the Weight of the Evidence</u>

Under the stringent "clearly erroneous" standard, none of the factual findings contested by appellants as "against the

manifest weight of the evidence" should be overturned.

A.   <u>Brandt's Testimony</u>

Appellants complain that the bankruptcy court improperly took Brandt's testimony out of context and relied too heavily on his statements that "DANA was treated specially" and was a "market investment" for GMBH, to the exclusion of Brandt's other testimony, in which he stated that GMBH granted up to five-year payment extensions to other companies, including one that was not expected to pay until it was profitable.

The bankruptcy court had the benefit of weighing the testimony of seventeen witnesses in the context of a five-day bench trial, during which, as appellee notes, volumes of evidence demonstrated that GMBH extended to DANA an extraordinary magnitude of credit, far greater than that extended to any third party.  Moreover, even if GMBH did allow other debtors payment extensions, this one fact would not negate the court's finding that the "family" relationship with DANA was different, did not give rise to arms-length transactions and warranted recharacterization of the debt to equity.  Nor would it, as appellants argue, require the conclusion that GMBH made an equity investment in the other companies from whom it did not require prompt payment.  The recharacterization analysis is much more nuanced than that.

B.   The Extension of Credit in the Business

_____Appellants' similar argument that everyone, even DANA,
extends credit does not undermine the bankruptcy court's
conclusion.  Appellants cite a customer that DANA allowed to
defer its payments on parts for years, with interest accruing,
and also describe how GMBH was given years to repay its own debt
to lenders, which allowed deferral until GMBH was expected to be
cash-positive.  GMBH also presented an expert who explained that
lenders may defer payment in return for additional compensation
if a debtor has a business plan.  This fact alone is not
significant enough to overturn the bankruptcy court's assessment
of this testimony together with evidence of the specific
relationship between GMBH and DANA.

C.   Construing the Deferral of Payment as an Agreement to
     Subordinate the Inter-Company Liability

_____Appellants argue that the bankruptcy court had no basis to
conclude that GMBH had a de facto agreement to subordinate its
debt to that of third-party creditors.  That argument fails
because, as appellee notes, the court did not actually make such
a finding, but rather used the description parenthetically,
merely to describe the effect of the lack of a fixed maturity
date for the payments to GMBH, which itself is a proper factor in
the recharacterization analysis.  Appellants' argument also fails
because once again, they attempt to isolate the effect of one
factor considered by the court--deferral of payments--in conflict

29

with the contextual recharacterization analysis.  Although deferral does not *alone* establish a <u>de</u> <u>facto</u> subordination agreement, the court made no such finding.  Appellants also misconstrue the nature of recharacterization in arguing that by even discussing the "subordination" of GMBH's claim to that of DANA's creditors, the court acknowledged the owed amounts as debt and therefore was incorrect in recharacterizing them as equity.  Yet, again, the very result of recharacterization is the effective *subordination* of the equity amounts to all creditors, whose claims will be fulfilled before the investor is paid.  Finally, appellants argue that there was no affirmative evidence in the record that GMBH would wait until all creditors were paid off before beginning to expect payment from DANA, claiming that DANA easily could have been cash-positive in a given year, begun paying GMBH and still had debt on the books.  As such, appellants contend that the court's holding was based on the erroneous conclusion that GMBH had agreed to wait for repayment until the value of DANA's assets in forced liquidation would be sufficient to pay off all of its creditors.  This argument is a gross exaggeration of what the bankruptcy court found.

In summary, as stated above, the bankruptcy court's factual findings were properly based on a careful assessment of the evidence of GMBH's admitted "special" and symbiotic relationship with DANA, and the court applied the correct legal framework in recharacterizing the debt as equity.  As such, the decision of

the bankruptcy court will be affirmed in all respects by an Order
to be issued with this Opinion.

Entered this 18th day of July, 2005.

_____/s/_____
Leonie M. Brinkema
United States District Judge

Alexandria, Virginia